OPINION *Page 2 
{¶ 1} Plaintiff-appellant James Helfrich appeals the May 31, 2006 Judgment Entry of the Licking County Court of Common Pleas denying his motion to reverse the jury verdict in favor of defendant-appellee Sherri L. Mellon, and granting Appellee's motion for attorney fees.
 STATEMENT OF THE FACTS AND CASE {¶ 2} This case arises from a forcible entry and detainer action filed by appellant James Helfrich against appellee Sherri Mellon. The complaint alleged Appellee owed Appellant rent, re-rental charges and damages caused during her tenancy in Appellant's property. Appellee rented a residence owned by Appellant located at 180 Vine Street, Pataskala, Ohio pursuant to a written rental agreement. The lease agreement provided Appellee agreed to rent the house for $700 per month for a twelve month term.
 {¶ 3} Appellant served Appellee with a written eviction notice on August 11, 2003.
 {¶ 4} Appellee filed a counterclaim against Appellant alleging breach of the covenant of quiet enjoyment, trespass and violation of R.C.5321.04 and 5321.15, sexual harassment and retaliation.
 {¶ 5} Prior to trial, Appellee filed a motion in limine to exclude the testimony of Forest Williams, her former landlord. The case proceeded to trial on May 17, 2005. Prior to trial, the trial court granted Appellee's motion in limine.
 {¶ 6} On May 20, 2005, the jury returned a verdict in favor of Appellant in the amount of $569.56, but also a verdict in favor of appellee in the amount of $2,500 on her counterclaim. The jury interrogatory forms established the jury found Appellant *Page 3 
invaded Appellee's privacy, trespassed, violated the notice requirement of R.C. 5321.04 and breached the covenant of quiet enjoyment. Neither party submitted special interrogatories to itemize the damages awarded on each claim.
 {¶ 7} On May 23, 2005, via Judgment Entry, the trial court confirmed the jury verdict.
 {¶ 8} On June 3, 2005, Appellant filed a motion to reverse the jury verdict. On June 15, 2005, Appellant filed a motion to disqualify Judge Branstool, which the trial court granted. On September 8, 2005, Judge Douglas James Bennett was assigned by the Supreme Court of Ohio to the case.
 {¶ 9} On June 1, 2005, Appellee filed a motion for attorney's fees pursuant to R.C. 5321.04(A)(8). On January 10, 2006, the trial court conducted a hearing on the motion. On May 31, 2006, the trial court granted Appellee's motion for fees, awarding Appellee $48,048.
 {¶ 10} Appellant now appeals, assigning as error:
 {¶ 11} "I. THE TRIAL COURT ERRED IN AWARDING MS. MELLON'S ATTORNEY'S FEES BECAUSE THERE WAS NO EVIDENCE THAT THE R.C. § 5321.04(B) VIOLATION RESULTED IN ACTUAL DAMAGES AND THE TRIAL COURT FAILED TO LIMIT ATTORNEY'S FEES TO WORK RELATED TO THE R.C. § 5321.04(B) VIOLATION.
 {¶ 12} "II. THE TRIAL COURT ERRED IN SUBMITTING TO THE JURY THE ISSUE OF WHETHER MR. HELFRICH WAIVIED [SIC] HIS CLAIM FOR UNPAID RENT. *Page 4 
 {¶ 13} "III. THE TRIAL COURT ERRED IN RULING ON THE POST-TRIAL MOTIONS WITHOUT CONSIDERING THE EVIDENCE THAT WAS PRESENTED AT TRIAL.
 {¶ 14} "IV. THE TRIAL COURT ERRED IN EXCLUDING FOREST WILLIAMS, MS. MELLON'S PRIOR LANDLORD, FROM TESTIFYING AT TRIAL.
 {¶ 15} "V. THE TRIAL COURT ERRED IN ITS EVIDENTIARY RULINGS THROUGHOUT THE TRIAL ALLOWING INADMISSIBLE EVIDENCE PRESENTED BY MS. MELLON.
 {¶ 16} "VI. THE TRIAL COURT ERRED, TO THE PREJUDICE OF MR. HELFRICH, IN EXCLUDING HIM FROM BENCH CONFERENCES AND CONVERSATIONS HELD IN CHAMBERS.
 {¶ 17} "VII. MR. HELFRICH IS ENTITLED TO A NEW TRIAL TO PRESENT THE AFFIRMATIVE DEFENSE THAT HE HAD A UTILITY EASEMENT."
 I. {¶ 18} In the first assignment of error, Appellant argues the trial court erred in awarding Appellee attorney fees where there was no evidence of actual damages arising from Appellant's violation of R.C.5321.04(B). Appellant further asserts the trial court failed to limit the fees awarded to those actually related to the R.C. 5321.04
violation.
 {¶ 19} R.C. Section 5321.04(B) states:
 {¶ 20} "(B) If the landlord makes an entry in violation of division (A)(8) of this section, makes a lawful entry in an unreasonable manner, or makes repeated demands for entry otherwise lawful that have the effect of harassing the tenant, the tenant may *Page 5 
recover actual damages resulting from the entry or demands, obtain injunctive relief to prevent the recurrence of the conduct, and obtain a judgment for reasonable attorney's fees, or may terminate the rental agreement."
 {¶ 21} As noted above, neither party submitted interrogatories to itemize the damages awarded on each of Appellee's counterclaims. The jury awarded Appellee damages on multiple theories, and absent such an interrogatory, we cannot say the jury did not award damages pursuant to Appellant's R.C. 5321.04 violation. The burden rests with Appellant to demonstrate in the record the jury did not award actual damages on the statutory violation. Appellant cannot use his failure to request such interrogatories as a sword to collaterally attack the general verdict. Accordingly, the trial court did not abuse its discretion in awarding Appellee attorney fees based upon Appellant's violation of R.C. 5321.04.
 {¶ 22} Appellant further argues the trial court erred in awarding Appellee all of her attorney fees without regard to whether they were related to the prosecution of her statutory damages claim.
 {¶ 23} Fees awarded relative to a violation of R.C. Section 5321.04
must be limited to work related to the landlord's entry into the rented premises. Iwenofu v. Consolidated Mgt., Inc. (1988), 49 Ohio App.3d 33.
 {¶ 24} Specifically, Appellant cites the following testimony of Appellee's counsel at the January 10, 2006 evidentiary hearing:
 {¶ 25} "Q. You mentioned that there was substantial amount of depositions that were taken in this case, but those were all taken in the Common Pleas case, correct?
 {¶ 26} "A. That's incorrect. They were taken in both cases. *Page 6 
 {¶ 27} "Q. Captioned in the Common Pleas case?
 {¶ 28} "A. I don't know how they were captioned, but they were for both cases. It was understood like that.
 {¶ 29} "Q. I want to bring your attention to a couple of the depositions here that you've taken or that were taken, rather. Uh . . . the first, January 17, 2005, according to your invoice, you have some time in there for a deposition of . . . of . . . there was a deposition of your client, Ms. Mellon, as well as her kids, on that particular date. It's on your invoice.
 {¶ 30} "A. What date is that?
 {¶ 31} "Q. January 17, 2005.
 {¶ 32} "A. That was her second deposition?
 {¶ 33} "Q. That's correct.
 {¶ 34} "A. Ok.
 {¶ 35} "Q. Uh . . . that deposition . . . you specifically stated in the deposition, I think she mentioned as well, related solely to the fraud allegations.
 {¶ 36} "A. Well, that was the ostensible purpose for taking the deposition. But there were other things concerning her credibility that Mr. Helfrich tried to probe into.
 {¶ 37} "Q. The fraud allegations are in the Common Pleas case?
 {¶ 38} "A. That's correct, yes.
 {¶ 39} "Q. In March, on the 4th of March, I guess, 2005 . . .
 {¶ 40} "A. But her kids, I don't think that related to the fraud. Her kids related to uh . . . her testimony. Because Mr. Helfrich claimed that he should have an opportunity of *Page 7 
redeposing the children and was permitted to do so. He did so. That was for both cases.
 {¶ 41} "Q. Then March 4, 2005, you took the deposition of uh . . . the deposition of Officer Lowe, I believe her name might have changed, Officer Lowe. You took that deposition or the deposition was taken?
 {¶ 42} "A. Mr. Helfrich took it.
 {¶ 43} "Q. Ok. And that was also based upon the fraud case that was in the Common Pleas Court?
 {¶ 44} "A. No. He had her testify, actually, in the uh . . . Municipal Court. That was for both cases. I don't know how it was filed, but it was used for both cases. It was understood that it was to be used for both cases.
 {¶ 45} "Q. On February 11, 2005, the deposition of Mr. Helfrich was taken. I believe, by you and also of a Ms. Berger?
 {¶ 46} "A. Bugher . . . B-U-G-H-E-R.
 {¶ 47} "Q. Ok. I apologize. I wasn't sure how to pronounce the name. Uh . . . in fact, Ms. Bugher, her deposition, didn't have anything to do with notice at all. In fact, it wasn't even talked about.
 {¶ 48} "A. That's correct. That related to all sorts of things. Mr. Helfrich asked her all sorts of questions about . . . well, I'm trying to . . . because we had her on our witness list at some point, but not related to the notice requirement. I think that's correct.
 {¶ 49} "Q. Now, on February 11, 2005, on your invoice, on your billing statement, you've indicated four and a half hours with regard to talking to Brian Garvine; it's B. Garvine. I assume it's Brian? *Page 8 
 {¶ 50} "A. That's correct.
 {¶ 51} "Q. About depositions? You talked with . . . with Ms. Bugher about . . .
 {¶ 52} "A. I'm sorry. What date?
 {¶ 53} "Q. February 11, 2005. You talked to Ms. Bugher about her deposition, prepared, prepared for her deposition, the deposition of Mr. Helfrich, went to Pataskala, then took the deposition of Ms. Bugher and Mr. Helfrich, and then returned to the office. Now, the deposition of Ms. Bugher had absolutely nothing to do with the notice requirement. You've block billed 4.5 hours. There's no way to distinguish those hours that were arguably related to anything involving notice and those that weren't.
 {¶ 54} "A. Yeah. I agree with you. I think that um . . . that that did not relate to the notice requirement as far as I recall.
 {¶ 55} "Q. But you block billed those entries, some of those entries, some of which may be related to notice, some of which had absolutely nothing to do with the claim.
 {¶ 56} "A. Which one are you talking about?
 {¶ 57} "Q. Same date. February 11th. You block billed things that had nothing to do with the notice claim in the time that may have been related to [sic] notice claim.
 {¶ 58} "A. February 11th?
 {¶ 59} "Q. 2005.
 {¶ 60} "A. I also took deposition of Mr. Helfrich that day.
 {¶ 61} "Q. Right. That's correct. Some items that arguable [sic] may be related, some that were not.
 {¶ 62} "* * * *Page 9 
 {¶ 63} "Q. So, on May 13, 2005, you got an invoice here of the time uh . . . you've alleged here is related to the notice claim and some of the time, you admit, is not related to the notice claim?
 {¶ 64} "A. That's correct, yes."
 {¶ 65} Tr. at 26-35.
 {¶ 66} The burden of establishing the amount and basis for an award of attorney fees rests with the party claiming entitlement to the fees.Adams v. Fleck (1961), 171 Ohio St. 451.
 {¶ 67} Appellant argues the fees awarded relative to the violation of R.C. 5321.04 were interrelated with the fees incurred in appellee's violation of the right to privacy, breach of quiet enjoyment and trespass. Appellant relies on the United States Supreme Court decision in Hensley v. Eckherhart (1983), 461 U.S. 424, asserting he is entitled to fees on claims for which there is no entitlement to fees, so long as the claims are interrelated.
 {¶ 68} In Hensley, the plaintiffs brought a Civil Rights action on behalf of all persons involuntarily confined at a forensic unit of a state hospital, challenging the constitutionality of treatment and conditions at the hospital. The United States District Court found constitutional violations, and awarded plaintiffs attorney fees per the Civil Rights statute.
 {¶ 69} The United States Supreme Court held:
 {¶ 70} "The product of reasonable hours times a reasonable rate does not end the inquiry. There remain other considerations that may lead the district court to adjust the fee upward or downward, including the important factor of the "results obtained." FN9 *Page 10 
This factor is particularly crucial where a plaintiff is deemed "prevailing" even though he succeeded on only some of his claims for relief. In this situation two questions must be addressed. First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?
 {¶ 71} "FN9. The district court also may consider other factors identified in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714,717-719 (CA5 1974), though it should note that many of these factors usually are subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate. See Copeland v. Marshall, 205 U.S.App.D.C. 390, 400, 641 F.2d 880, 890 (1980) (en banc).
 {¶ 72} "In some cases a plaintiff may present in one lawsuit distinctly different claims for relief that are based on different facts and legal theories. In such a suit, even where the claims are brought against the same defendants-often an institution and its officers, as in this case-counsel's work on one claim will be unrelated to his work on another claim. Accordingly, work on an unsuccessful claim cannot be deemed to have been "expended in pursuit of the ultimate result achieved." Davis v. County of Los Angeles, 8 E.P.D. ¶ 9444, at 5049 (CD Cal. 1974). The congressional intent to limit awards to prevailing parties requires that these unrelated claims be treated as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim.
 {¶ 73} Upon review, the entries prepared by Appellee's attorneys were block billed, and did not specify which entries were allotted to the statutory notice violation claim, nor the unsuccessful claims for sexual harassment and retaliation. As noted *Page 11 
supra, Appellee admitted some hours were for unrelated claims in a separate lawsuit. The trial court could not determine whether the work was related to the statutory notice violation claim or a separate claim interrelated with the notice violation. While we believe the successful prosecution of the privacy, trespass and quiet enjoyment claims are interrelated to the notice violation, the trial court improperly awarded the entire amount of attorney fees invoiced without determining the amount of fees so related. Although the jury awarded Appellant a general verdict on her several counterclaims, the trial court must only award attorney fees related to the statutory notice violation or on claims interrelated thereto.
 {¶ 74} Accordingly, Appellant's first assignment of error is overruled, in part, and sustained, in part, and the matter is hereby remanded to the trial court for a redetermination of attorney fees allowable pursuant to the R.C. 5321.04 violation.
 II. {¶ 75} In the second assignment of error, Appellant asserts the trial court erred in submitting to the jury the issue of whether Appellant waived his claim for unpaid rent.
 {¶ 76} Upon review, Appellant does not cite to where in the record he objected to the trial court's proceedings relative to his claim of unpaid rent.
 {¶ 77} Ohio Appellate Rule 16, states in pertinent part:
 {¶ 78} "(A) Brief of the appellant
 {¶ 79} "The appellant shall include in its brief, under the headings and in the order indicated, all of the following:
 {¶ 80} * * * *Page 12 
 {¶ 81} "(7) An argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies. The argument may be preceded by a summary.
 {¶ 82} "(D) References in briefs to the record
 {¶ 83} "References in the briefs to parts of the record shall be to the pages of the parts of the record involved; e.g., Answer p. 7, Motion for Judgment p. 2, Transcript p. 231. Intelligible abbreviations may be used. If reference is made to evidence, the admissibility of which is in controversy, reference shall be made to the pages of the transcript at which the evidence was identified, offered, and received or rejected."
 {¶ 84} Based upon Appellant's failure to reference where in the record he objected to the proceedings presented in his argument, we overrule the second assignment of error.
 III. {¶ 85} In the third assignment of error, Appellant argues the trial court erred in ruling on the post-trial motions without considering the evidence presented at trial.
 {¶ 86} When a party files a motion for new trial on the ground the judgment is not sustained by the sufficiency of the evidence, the trial court has a duty to review the evidence presented at trial and weigh the sufficiency of the evidence and the credibility of the witnesses.Rohde v. Farmer (1970), 23 Ohio St.2d 82. Similarly, when a party files a motion for judgment notwithstanding the verdict, the trial court must consider the legal sufficiency of the evidence. McLeod v. Mt. Sinai Med.Ctr. (2006), 166 Ohio App.3d 647. *Page 13 
 {¶ 87} Appellant argues, following Judge Branstool's recusal, upon the case being transferred to Judge Bennett, Judge Bennet failed to consider any evidence presented at trial before ruling on the post-trial motions.
 {¶ 88} Appellant filed a motion to reverse the jury verdict. In the motion, Appellant argues Appellee failed to present evidence to support one of the elements of her invasion of privacy claim and the manifest weight of the evidence did not support a finding in favor of Appellee on the claim of intentional infliction of emotional distress. Appellant asserts Judge Bennett did not review the evidence presented at trial prior to ruling on Appellant's motion on May 30, 2006, as a transcript of the proceedings was not prepared until Appellant filed his appeal.
 {¶ 89} Upon review, Appellant filed his motion to reverse the jury verdict on June 3, 2005. On June 15, 2005, appellant filed a motion to disqualify Judge Branstool, which the trial court granted. On September 8, 2005, Judge Douglas James Bennett was assigned by the Supreme Court of Ohio to the case. Accordingly, Appellant himself moved the court for a new judge to rule on the post-trial motions, and Appellant assumed the responsibility of preparing a transcript of the proceedings. A movant for a new trial has the duty to present the evidence necessary to support a motion for a new trial. See Whiston v. Bio-Lab, Inc. (1993),85 Ohio App.3d 300, 308, 619 N.E.2d 1047, 1051; Potocnik v. SifcoIndustries, Inc. (1995), 103 Ohio App.3d 560. Having successfully moved to disqualify Judge Brandstool and having failed to provide Judge Bennett with the trial transcript, we find Appellant is estopped from asserting trial court error in this regard.
 {¶ 90} The third assignment of error is overruled. *Page 14 
 IV. {¶ 91} In the fourth assignment of error, Appellant maintains the trial court erred in excluding the testimony of Forest Williams, Appellee's previous landlord. Appellant sought to introduce the testimony to challenge Appellee's character for truthfulness and to support his claim for rent.
 {¶ 92} In State v. Maurer (1984), 15 Ohio St.3d 239, the Ohio Supreme Court held:
 {¶ 93} "This analysis by Texas is in accord with Ohio's recent appellate court decisions in State v. White (1982), 6 Ohio App.3d 1,451 N.E.2d 533, and State v. Wilson (1982), 8 Ohio App.3d 216, 219-220,456 N.E.2d 1287. The court in Wilson stated that "* * * if the trial judge had denied the motion in limine by ruling that the evidence was proper, counsel asserting the objection would have been obliged to challenge the evidence when the full context of the evidentiary issue was presented during the trial. Failure to object to evidence at the trial constitutes a waiver of any challenge, regardless of the disposition made for a preliminary motion in limine." Id. at 220, 456 N.E.2d 1287.FN14 See, also, Caserta v. Allstate Ins. Co. (1983),14 Ohio App.3d 167, 170, 470 N.E.2d 430.
 {¶ 94} "FN14. The use of motions in limine in Ohio courts is ably synthesized by a passage from Palmer, Ohio Rules of Evidence, Rules Manual (1984), which provides at 446 in part:
 {¶ 95} "`A motion in limine may be used in two different ways. First, it may be used as the equivalent of a motion to suppress evidence, which is either not competent or improper because of some unusual circumstance. Second, it may be used as a *Page 15 
means of raising objection to an area of inquiry to prevent prejudicial questions and statements until the admissibility of the questionable evidence can be determined during the course of the trial. It is a precautionary request, directed to the inherent discretion of the trial judge, to limit the examination of witnesses by opposing counsel in a specified area until its admissibility is determined by the court outside of the presence of the jury. The sustaining of a motionin limine does not determine the admissibility of the evidence to which it is directed. Rather it is only a preliminary interlocutory order precluding questions being asked in a certain area until the court can determine from the total circumstances of the case whether the evidence would be admissible. When sustained, losing counsel should make aproffer of the otherwise excluded evidence at the proper time during thetrial and have a second determination or hearing by the court as to itsadmissibility. * * *
 {¶ 96} "Although extremely useful as a trial technique, the ruling ina motion in limine does not preserve the record on appeal. The ruling is as [sic] tentative, preliminary or presumptive ruling about an evidentiary issue that is anticipated but has not yet been presented in its full context. An appellate court need not review the propriety of such an order unless the claimed error is preserved by an objection, proffer, or ruling on the record when the issue is actually reached and the context is developed at trial." (Emphasis added.)
 {¶ 97} "`An appellate court need not consider an error which a party complaining of the trial court's judgment could have called, but did not call, to the trial court's attention at a time when such error could have been avoided or corrected by the trial court." State v.Williams (1977), 51 Ohio St.2d 112, 364 N.E.2d 1364 [5 O.O.3d 98], *Page 16 
paragraph one of the syllabus, vacated in part on other grounds (1978), 438 U.S. 911, 98 S.Ct. 3137, 57 L.Ed.2d 1156. Appellant's failure to object at trial in the case sub judice constituted a waiver of this evidentiary issue.
 {¶ 98} As stated in the statement of the case supra, the trial court granted Appellee's motion in limine excluding the testimony of Forest Williams. Prior to the commencement of trial, the court stated on the record:
 {¶ 99} "The Court: Alright. Well, that's my ruling. I'm going to grant the motion in limine. It's an in limine ruling. If uh . . . additional facts are presented during the course of the trial you can certainly call my attention to them and make additional argument at that time."
 {¶ 100} Tr. at p. 12.
 {¶ 101} Upon review of the record, Appellant did not seek to introduce the testimony of Forest Williams at trial; nor did he attempt to proffer William's testimony or make any additional arguments for the admission of the same. Accordingly, the fourth assignment of error is overruled.
 V. {¶ 102} In his fifth assignment of error, Appellant asserts the trial court erred throughout the trial in this matter in allowing inadmissible evidence presented by Appellee.
 {¶ 103} Specifically, Appellant cites the introduction of testimony relative to his interaction with Officer Lowe of the Pataskala Police Department. The following exchange occurred at trial in this matter: *Page 17 
 {¶ 104} "Q. Now, um . . . Detective Lowe had a conversation . . . called you at home didn't she?
 {¶ 105} "A. She called and left a message that she wanted to talk to me about trespass. That was on the 9th . . . 29th of August. I don't know if I received it, my message, I retrieved it at that time. That's when the date was on the message.
 {¶ 106} "Q. Now, later I'm talking about. You actually did talk to Detective Lowe, or Detective Powell, um . . . after the eviction hearing in September, correct?
 {¶ 107} "A. Yes.
 {¶ 108} "Q. And um . . . didn't you hang up on her during your phone conversation you had with her?
 {¶ 109} "Mr. Marsh: Your Honor, I'm going to object. I don't understand the relevance about it at all. Whether he did or didn't.
 {¶ 110} "The Court: Response?
 {¶ 111} "Mr. Spater: Your Honor, really relates to . . . he testified how he dealt with Detective Lowe and how he . . . the complaint, it was just to follow up on it. That actually he didn't really provide information. He just hung up on her.
 {¶ 112} "The Court: Alright. I'll allow it. Objection's overruled.
 {¶ 113} "Q. Mr. Helfrich, didn't you hang up on Detective Lowe when she was asking you questions?
 {¶ 114} "A. No. We were through with our conversation. I said, "If you don't have anything else, I'm going to get back to my kids." It was 10:30 at night on a Sunday night she called me. *Page 18 
 {¶ 115} "Q. Well, you had . . . you were present during her deposition, were you not? Correct?
 {¶ 116} "A. Yes.
 {¶ 117} "Q. Didn't she testify that you made some choice words to her and then you hung up on her?
 {¶ 118} "A. I can't remember how she testified to that.
 {¶ 119} "Q. Ok. Well, isn't that what happened? You made some comments to her then hung up n [sic] her?
 {¶ 120} "A. Uh . . . the problem with it was that Officer Lowe continued to call every night to ask the same question. That particular night, when she did it every night, called and she asked, "Well, did you trespass on the property?" We continued. This was a month after this after the 6th. I asked her . . . I said, `Did you talk to the three or four people that I gave you already for witnesses?" She said, "No." I said, "Why do you continue to call my home and keep asking me the same question?" She said, "Well, we're just trying to get it resolved." I said, "Well, if you just ask the people who are witnesses then, we could put this thing to bed, but you continue to call me at my home after hours to ask the same question." Then she asked me, she says, "Well, have you every [sic] trespassed on that home?" I said, "Well, no." She said, "Well, have you entered the property?" I said, "I've owned the property for 10 or 15 years now." She said, "Will you please put in writing each day you never trespassed?" I says, "Do you want me to put in on September 1st I did not trespass?" She said, "Yes." I said, "Then do you want me to put down on September 2nd, I did not trespass?" She said, "Yeah." I *Page 19 
said, "But I've owned it for 15 years." She said, "Will you do it for every day?" I said, "You've got to be kidding me." I said, "If you would write it all up for me and you and you do that and you spend all you [sic] time to write up every day for the last 15 years or 10 years or 5 years or whatever I told her that I didn't trespass, but please don't call my home any more at 10:30 at night. I've already got my kids in bed."
 {¶ 121} Tr. at 122-124.
 {¶ 122} Upon review of the testimony, Appellant has not demonstrated prejudice as a result of the trial court's admitting the same. Appellant responded he did not hang up on Officer Lowe, and was able to explain to the jury the context of his conversation.
 {¶ 123} Second, Appellant cites Mary Cheplowitz's testimony introduced at trial relative to Appellant's alleged conduct and activities at the property. At trial, Cheplowitz testified:
 {¶ 124} "Q. Now, did Mr. Helfrich contact you?
 {¶ 125} "A. Yes, he did.
 {¶ 126} "Q. After this case was filed?
 {¶ 127} "A. Yes, he did.
 {¶ 128} "Q. What did he say to you?
 {¶ 129} "A. Well, he initially called and left me a message and then called back again and wanted to ask me, you know, he said he wanted to know what I knew about um . . . this case. I just didn't feel comfortable talking to him over the phone.
 {¶ 130} "Q. Did he indicate that you had been identified as a witness in the case?
 {¶ 131} "A. Yes. He did indicate that I had been identified as a witness and he wanted to ask me some questions. *Page 20 
 {¶ 132} "Q. Can you tell us about your interaction with Mr. Helfrich after that?
 {¶ 133} "Mr. Marsh: I'm going to object to that, Your Honor. I don't see the relevance in this.
 {¶ 134} "The Court: Response?
 {¶ 135} "Mr. Spater: Shall we approach?
 {¶ 136} "The Court: Sure. Objection is overruled. Mr. Spater, you may resume your questioning.
 {¶ 137} "Q. Mrs. Cheplowitz, um . . . describe your interaction with Mr. Helfrich after that initial conversation.
 {¶ 138} "A. Well, to even just to finish the initial conversation I told him I did not feel comfortable talking to him over the phone and he persisted in trying to ask me what I knew about it. Even became rude and said that, "We can do this the hard way or the easy way."
 {¶ 139} "Q. I'm sorry. I didn't hear that.
 {¶ 140} "A. He said, "We can either do this the hard way or the easy way." I told him at that point, obviously, he needs to do what he needs to do. Um . . . after that period of time he would frequently drive past our house and um . . . and stare at me. He would purposefully, I feel, purposefully drive his children to and from school. I drive my children to and from school as well and would, even though that was not the most direct route for him to take his children, he would purposefully drive back and forth that way. Often I would come down my street and, actually, the alley that sits in front of the property that Sherri lived in is directly across from my driveway. So, I'd come home a lot and his truck would be there. Sitting there. There wouldn't be any traffic so he *Page 21 
wouldn't be stopped because there was traffic flowing down the street, you know, He would sit there and wait and purposefully stare at me. I think in an attempt to intimidate me and make me feel uncomfortable.
 {¶ 141} "Q. Now, um . . . there'd been a little testimony about a zoning dispute that you and your husband had with Mr. Helfrich, correct?
 {¶ 142} "A. Well, it wasn't . . . he had a zoning dispute with the City. He had purchased a piece of property that was zoned single family and had wanted to build apartments on it. Obviously, as homeowners, we wanted it to maintain single family status. So, we spoke out. They have to notify the people in the area and so, we did speak out against the zoning change.
 {¶ 143} "Q. How many people spoke out at that hearing?
 {¶ 144} "Mr. Marsh: Objection, Your Honor.
 {¶ 145} "The Court: Overruled.
 {¶ 146} "A. There were several.
 {¶ 147} "Q. Men and women?
 {¶ 148} "A. It was mostly men. I think I was probably the only woman that actually spoke.
 {¶ 149} "Q. Did Mr. Helfrich take any depositions for that zoning matter?
 {¶ 150} "A. Yes.
 {¶ 151} "Mr. Marsh: Objection.
 {¶ 152} "The Court: Overruled.
 {¶ 153} "Q. Whose depositions were taken?
 {¶ 154} "A. In terms of the neighbors? *Page 22 
 {¶ 155} "Q. Yes.
 {¶ 156} "A. I mean, because that's the only ones I would know, um . . . was mine.
 {¶ 157} "Q. Were you the only one who was deposed by him?
 {¶ 158} "A. Yes. Of the neighbors that spoke out against him, yes."
 {¶ 159} Tr. at 39-41.
 {¶ 160} Upon review of the record, Appellant's counsel opened the door for Mary Cheplowitz's testimony in cross-examining her husband, Jay Cheplowitz relative to the zoning issue in an attempt to show bias against Appellant. Though we find little relevance of this testimony to the issues at hand, the trial court did not abuse its discretion in admitting the evidence.
 {¶ 161} Third, Appellant argues the trial court erred in instructing the jury regarding Appellant's duty to mitigate. Appellant asserts, while proper as a matter of law, the instruction was inapplicable to this case, as there was no testimony regarding mitigation.
 {¶ 162} A strong presumption exists in favor of the propriety of jury instructions. In general, the trial court should give requested jury instructions "if they are correct statements of the law applicable to the facts of the case." Burns v. Prudential Securities, Inc. (2006),167 Ohio App.3d 809; quoting Murphy v. Carrolton Mfg. Co. (1991),61 Ohio St.3d 585.
 {¶ 163} An error in instructions given in a civil trial is not grounds for reversal unless it is calculated to mislead the jury to the detriment of the party seeking reversal. Margroff v. Cornwell QualityTools, Inc. (1991), 81 Ohio App.3d 174. *Page 23 
 {¶ 164} As discussed in our analysis and disposition of Appellant's first assignment of error, neither party requested jury interrogatories; rather, the jury returned a general verdict. As such Appellant cannot demonstrate prejudice resulting from the jury instruction, and we presume the propriety of the instruction. Further, Appellant himself testified at trial as to his attempts to advertise the property in the newspaper, opening the door for the trial court to provide the instruction. Furthermore, the jury may have found the issue of mitigation was moot if the jury believed Appellant abandoned his claim for future rent as part of the resolution of his forcible entry and detainer claim. As was the case in the first assignment of error, the lack of interrogations precludes Appellant from affirmatively demonstrating prejudice from the giving of that mitigation instruction.
 {¶ 165} The fifth assignment of error is overruled.
 VI. {¶ 166} In the sixth assignment of error, appellant argues the trial court erred in excluding him from bench conferences and conversations held in chambers.
 {¶ 167} However, the record is void of any demonstration the trial court excluded Appellant from bench conversations or proceedings in chambers. The burden rests with Appellant to make an affirmative demonstration of the alleged error with citations to the record. Accordingly, we overrule the assignment of error.
 VII. {¶ 168} In his final assignment of error, Appellant argues he is entitled to a new trial to present an affirmative defense of a utility easement. *Page 24 
 {¶ 169} Appellant did not raise this argument in the proceedings before the trial court; therefore, the argument is waived on appeal. Appellant's seventh assignment of error is overruled.
 {¶ 170} For the reasons set forth above, the May 31, 2006 Judgment Entry of the Licking County Court of Common Pleas is affirmed, in part; reversed, in part, and remanded for further proceedings relative to the calculation of attorney fees.
Hoffman, P.J. Wise, J. and Delaney, J. concur.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the May 31, 2006 Judgment Entry of the Licking County Court of Common Pleas is affirmed, in part; reversed, in part, and remanded for further proceedings relative to the calculation of attorney fees. Costs assessed to Appellant. *Page 1