OPINION
{¶ 1} Defendant-appellant Zimmer Orthopaedic Surgical Products, Inc. ("Zimmer") appeals the July 9, 2007 Judgment Entry entered by the Tuscarawas County Court of Common Pleas, which denied its Motion for Judgment Notwithstanding the Verdict or for New Trial. Defendant-appellant Administrator, Bureau of Workers' Compensation ("BWC") also appeals the same July 9, 2007 Judgment Entry, which denied its Motion to Join Defendant-Employer, Zimmer Orthopaedic's, Motion for Judgment Notwithstanding the Verdict and for New Trial. Plaintiff-appellee is Julie K. Stoneman.
 STATEMENT OF THE CASE AND FACTS {¶ 2} On July 19, 2005, after the Industrial Commission denied Appellee the right to benefits under the Workers' Compensation Fund for the conditions of left rotator tendinitis, left bicep tendinitis, left bicipital tenosynovitis, and aggravation of arthritis of the acromioclavicular ("AC") joint, Appellee filed a Complaint in the Tuscarawas County Court of Common Pleas, against Zimmer, her employer, and BWC. Zimmer and BWC filed timely answers to Appellee's Complaint. The matter proceeded through discovery, with trial commencing on September 19, 2006.
 {¶ 3} At trial, Appellee testified she commenced her employment with Zimmer on January 21, 1991. During the first seven years of her employment, Appellee worked in a number of different departments including the irrigation and housekeeping departments. Appellee began working in the packaging department in 1998, or 1999. Appellee did not experience any problems with her left shoulder while she worked in the *Page 3 
irrigation and housekeeping departments. In 2001, Appellee presented to her family physician with complaints of pain in her left shoulder, radiating down her arm. Appellee consulted with a second doctor in February, 2002, who treated her with a cortisone injection, which helped alleviate the pain for approximately one year. Prior to her employment with Zimmer, Appellee was self-employed, owning a gift shop. Appellee had worked in a gift shop before opening her own business.
 {¶ 4} On March 3, 2003, Appellee completed an illness/injury report as she had been experiencing problems with her left shoulder for a period of three weeks. Zimmer scheduled an appointment for Appellee with Dr. Nicholas Varrati. After Dr. Varrati's examination and viewing a video of Appellee's day-to-day job activities, he placed Appellee under work restrictions. Dr. Varrati ordered an MRI, and after reviewing the results, referred Appellee to Dr. Thomas Teater. Appellee presented to Dr. Teater on May 2, 2003. Appellee stated, as a result of the problems with her left shoulder she did not work between September, 2003, and June, 2004. During that time, Appellee underwent two surgeries. On cross-examination, Appellee testified she did not have any knowledge she had arthritis prior to 2001.
 {¶ 5} Lisa Hadley, Appellee's co-worker and friend, testified she and Appellee worked together on the HemoVac line 2500 in the packaging department. Hadley described the two-person assembly procedure, explaining the first employee assembles a clip, inserts a "Y" connector into tubing and places a trocar into a drain. After the clip, tubing, and trocar are completed, the first employee wraps the clip and the tubing with the "Y" connector, and passes the items to a second employee. The second employee *Page 4 
wraps the trocar around the clip and the tubing with the "Y" connector, places the set into a pouch, seals and folds the pouch, places the first pouch into a second pouch which is also sealed, then sends the pouch on the conveyor to the packer. Hadley noted the standard for the HemoVac line 2500 in May, 2003, was 1,104 pieces/eight hour shift. An individual on the HemoVac line 2500 would repeat the same procedure over and over during an eight hour shift. In order to accomplish the standard 1,104 pieces/eight hour shift, an employee was required to seal the pump 2,208 times. To complete her portion of the procedure, the second employee on the line was required to reach forward, slightly elevating her arms and shoulders.
 {¶ 6} Dr. Nicholas V. Varrati, III., testified he treats patients or workers who develop occupational diseases as a result of repetitive movement. Dr. Varrati first saw Appellee on March 10, 2003. Dr. Varrati noted he viewed a videotape of the operations at Zimmer, and was familiar with the HemoVac assembly procedure. The doctor recalled Appellee presented with pain in her left shoulder and arm. Pursuant to Dr. Varrati's order, Appellee underwent an MRI. Dr. Varrati stated "[t]he impression from the MRI was a full thickness tear of the supraspinatus tendon, moderate acromioclavicular osteoarthropathy and clinical correlation for an impingmenet syndrome is recommended." Videotape Deposition of Nicholas Varratti, III at 20. Based upon the MRI findings, Dr. Varrati referred Appellee to Dr. Teater.
 {¶ 7} Appellee's counsel questioned Dr. Varrati as to the repetitive nature of Appellee's job. The exchange proceeded as follows: *Page 5 
 {¶ 8} "Q. Okay. If somebody were working the Hemovac line, does that recall — involve repetitive motion and repetitive movement?
 {¶ 9} "A. Yes.
 {¶ 10} "Q. Okay. Would somebody who works that Hemovac line undergo and perform more motion and more movement than the general public?
 {¶ 11} "* * *
 {¶ 12} "A. The activity that she was performing in the Hemovac was repetitious activity, and I think we have it at 1100 repetitions per hour. And so, there is repetitious activity in what she was doing * * * Normally, no, somebody doesn't continue to do something 1100 times per an eight-hour day. In their normal activity. * * * an average person, normal lifestyle, no, they don't do that.
 {¶ 13} "Q. Okay. Would somebody who performs that Hemovac double seal procedure as many times as you said, 1100, would they be at a higher risk for developing an occupational disease?
 {¶ 14} "* * *
 {¶ 15} "A. For developing an injury secondary to repetitive activities, yes.
 {¶ 16} "Q. If Julie Stoneman were performing those activities, would she be at a higher risk for develping an occupational disease?
 {¶ 17} "* * *
 {¶ 18} "A. Yes."
 {¶ 19} Id. at 11-12.
 {¶ 20} With respect to Appellee's conditions, Dr. Varrati opined: *Page 6 
 {¶ 21} "Q. * * * can repetitious movement such as what she was doing at Zimmer result in occupational diseases such as tendinitis and impingement syndrome?
 {¶ 22} "* * *
 {¶ 23} "A. The type of repetitious activities that she was doing with her upper extremity can cause tendinitis.
 {¶ 24} "* * *
 {¶ 25} "Q. Does [Appellee] or did [Appellee] suffer from left rotator cuff tendinitis?
 {¶ 26} "A. Yes, it was —
 {¶ 27} "Q. Now, is that based upon your history and the history of —
 {¶ 28} "A. Her history and her physical examination were consistent with the tendinitis, and obviously at the surgical [sic] when one actually saw the tendon, Dr. Teater felt that that was, that she had rotator cuff tendinitis.
 {¶ 29} "Q. Now, Doctor, I'm going to ask you for some opinions in my next line of questioning, and I'd like for you to base your opinions on reasonable medical certainty and probability. Can you do that?
 {¶ 30} "A. Yes.
 {¶ 31} "Q. Okay. Do you have an opinion as to whether or not [Appellee] suffers or did suffer from left rotator cuff tendinitis as a result of her work duties in May of 2003? First of all, do you have an opinion?
 {¶ 32} "A. Yes.
 {¶ 33} "Q. And what is your opinion?
 {¶ 34} "A. I believe she had tendinitis secondary to the repetitive activities of her left upper extremity. *Page 7 
 {¶ 35} "Q. And what's the basis of that opinion?
 {¶ 36} "* * *
 {¶ 37} "A. The patient's work duties, her physical examination, and her clinical course.
 {¶ 38} "Q. If someone has biceps tenosynovitis, should they also have a biceps tendinitis?
 {¶ 39} "A. Yes.
 {¶ 40} "Q. Are they two conditions?
 {¶ 41} "A. Yes, they're two separate conditions.
 {¶ 42} "Q. Do you have an opinion as to whether or not [Appellee] suffered from biceps tendinitis and biceps tenosyovitis as a result of her work activities she was performing on May 2 of 2003? First of all, do you have an opinion?
 {¶ 43} "* * *
 {¶ 44} "A. I felt — — yes. Yes, I do have an opinon.
 {¶ 45} "Q. And what is it?
 {¶ 46} "* * *
 {¶ 47} "A. I guess I have to explain this. Like I said, to me it's splitting hairs. If she had a significant amount of swelling in the tendon, she more than likely also had swelling of the synovium, or the sheath that secrets the fluid. And considering the extent that she was having soreness and limitation of motion, I believe the synovium was also involved.
 {¶ 48} "Q. Okay. So I don't want to put words in your mouth. Do you find that she did or did not? *Page 8 
 {¶ 49} "A. I find that she did. It's my opinion that she did. If, if you're asking do I have a pathology, you know, where I've taken a bit of the tendon and synovium saying that she has both, on, I don't.
 {¶ 50} "Q. Okay. But it's your opinion based upon reasonable certainty?
 {¶ 51} "A. Yes.
 {¶ 52} "* * *
 {¶ 53} "Q. And probability that she had both?
 {¶ 54} "A. Yes.
 {¶ 55} "* * *
 {¶ 56} "Q. Now, Doctor, I want to talk about a condition referred to as osteoarthritis. What is that?
 {¶ 57} "A. It's degenerative changes inside the joint.
 {¶ 58} "Q. And is it fair to say that as we age, all of us are going to develop arthritis?
 {¶ 59} "A. Yes.
 {¶ 60} "Q. Okay. Is it possible to have the arthritis and not have any symptoms?
 {¶ 61} "A. Yes.
 {¶ 62} "Q. Do you have feel that [Appellee] has arthritis of the left shoulder?
 {¶ 63} "A. She had arthritis of the acromioclavicular joint. * * *
 {¶ 64} "* * *
 {¶ 65} "Q. Do you feel that was caused by her occupational disease or do you feel that it was aggravated by her repetitious movement?
 {¶ 66} "* * * *Page 9 
 {¶ 67} "A. I believe it was aggravated by the repetitious activity.
 {¶ 68} "Q. And by aggravated, what do you mean?
 {¶ 69} "A. That it became more symptomatic because of the repetitive motion at the shoulder that she would need to have done.
 {¶ 70} "Q. Okay. Now, we're nearing the end of my examination, but what I'm trying to get at now is when somebody moves that shoulder up and down —
 {¶ 71} "A. They move the AC joint.
 {¶ 72} "Q. They move the AC joint. Can arthritis develop as a result of just normal wear and tear?
 {¶ 73} "A. Yes.
 {¶ 74} "Q. Everyday movement in that arm?
 {¶ 75} "A. Yes.
 {¶ 76} "* * *
 {¶ 77} "Q. So can somebody aggravate that condition with repetitive motion?
 {¶ 78} "A. With the repetitive activity causing it to move more often, yes.
 {¶ 79} "Q. So the more that you move that shoulder, the more irritated that joint gets?
 {¶ 80} "A. Yes.
 {¶ 81} "Q. And the more swelling you have in the tendons that you discussed for us?
 {¶ 82} "A. Yes. Very similar to somebody that has arthritis in the knee. If they walk on it and keep walking on it they're going to get more symptomatic."
 {¶ 83} Id. at 30-36, 40-42. *Page 10 
 {¶ 84} Dr. Thomas Teater testified he conducted his initial evaluation of Appellee on May 2, 2003, after a referral from Dr. Varrati, and recalled Appellee's primary complaint was ongoing difficulty with her left shoulder. Dr. Teater performed arthroscopic surgery on Appellee's left shoulder on December 19, 2003. As to his pre-and post-operative impressions of Appellee's condition, Dr. Teater testified:
 {¶ 85} "Q. Now, Doctor, what was your impression prior to doing the surgery in December of 2003?
 {¶ 86} "A. The working diagnosis that we had gone in with was painful left shoulder, suspicions for a partial tear of the rotator cuff, as well as AC joint arthritis.
 {¶ 87} "Q. And your suspicion of the partial tear of the left rotator cuff, was that identified on that previous MRI that we talked about?
 {¶ 88} "A. The abnormality seen on the MRI had raised some high suspicions that the cuff tear existed.
 {¶ 89} "Q. Now after the surgery you give us a postoperative diagnosis. Was that the same or was that different than your preoperative diagnosis?
 {¶ 90} "A. It had differed in that there was no identification of a cuff tear, but rather some irritation, some reddening of both the rotator cuff as well as the biceps.
 {¶ 91} "* * *
 {¶ 92} "Q. And what was your official postoperative diagnosis?
 {¶ 93} "A. Chronic rotator cuff and biceps tendonitis, acromioclavicular osteoarthritis.
 {¶ 94} "* * *
 {¶ 95} Transcript of Video Deposition of Thomas L. Teater, MD. at 31-32. *Page 11 
 {¶ 96} When Dr. Teater saw Appellee for a visit on January 20, 2004, the doctor noted Appellee had overall improvement with no major complaints. Dr. Teater read his patient notes from that visit:
 {¶ 97} "A. `Left rotator cuff and biceps tendonitis with acromioplasty and AC joint arthritis with distal clavicle resection. I do believe these are a direct result of her chronic repetitious work activities'."
 {¶ 98} Id. at 34.
 {¶ 99} Dr. Teater viewed a videotape of the operations at Zimmer. Appellee's counsel and the doctor had the following exchange:
 {¶ 100} "Q. If [Appellee] were in fact to perform those duties that you viewed on that tape and actually do the movements of one thousand times per shift outward and then two thousand times per shift straight out and back, would that be in your mind a repetitive activity?
 {¶ 101} "A. Yes, it would.
 {¶ 102} "Q. Is heavy lifting required in order to damage the shoulder joint as a result of repetitive activity?
 {¶ 103} "A. Not necessarily.
 {¶ 104} "Q. How about overhead lifting? Does someone have to actually lift over their head to damage that shoulder joint?
 {¶ 105} "A. No, they would not.
 {¶ 106} "Q. Do we all develop arthritis in our joints which would include the shoulder as we age and get older?
 {¶ 107} "A. Not everyone. *Page 12 
 {¶ 108} "Q. Not everyone. Can someone have arthritis in a joint and it be what we call asymptomatic?
 {¶ 109} "A. Yes, they could.
 {¶ 110} "Q. In other words, can someone as they get older have arthritis in a shoulder and not have any pain?
 {¶ 111} "A. Yes.
 {¶ 112} "Q. If you take someone who does have osteoarthritis of the shoulder, can that be affected by repetitive use?
 {¶ 113} "A. Yes, it could.
 {¶ 114} "Q. In other words, can repetitive movement aggravate arthritis in a shoulder?
 {¶ 115} "A. Yes, it could."
 {¶ 116} Id. at 35-36.
 {¶ 117} When asked his opinion of Appellee's conditions, Dr. Teater stated:
 {¶ 118} "Q. Now, Doctor, I'd like to ask you for your medical opinions, and again I'd like for you to based your opinions on reasonable medical certainty and probability.
 {¶ 119} "First of all, do you have an opinion as to whether or not the work activities and the repetitive motion that [Appellee] explained to you were a result of the left shoulder impingement syndrome?
 {¶ 120} "* * *
 {¶ 121} "Q. First of all, do you have an opinion?
 {¶ 122} "A. I believe there is a direct causal relationship between the two.
 {¶ 123} "Q. And what's the basis of that opinion? *Page 13 
 {¶ 124} "* * *
 {¶ 125} "A. Repetitive type motion can create inflammation and pain. The forward elevation, the forward reaching would be typical of some impingement type symptoms. The impingement would be the pain on forward elevation. Doing that a thousand times or two thousand times nightly I think was a direct contribution.
 {¶ 126} "* * *
 {¶ 127} "Q. Now, Doctor, I want to ask you for your opinion on the cause of the left rotator cuff tendonitis. Do you have an opinion based upon reasonable orthopaedic certainty and probability as to the cause of that condition?
 {¶ 128} "* * *
 {¶ 129} "A. I believe that the repetitious nature of her position at Zimmer was a direct causal, created a direct causal relationship to the onset of her rotator cuff tendonitis.
 {¶ 130} "Q. Do you have an opinion as to the cause of the left biceps tendonitis?
 {¶ 131} "* * *
 {¶ 132} "A. I believe it's the same. It's the repetitious nature of her job.
 {¶ 133} "Q. And do you have an opinion as to the left bicipital tenosynovitis?
 {¶ 134} "* * *
 {¶ 135} "A. Which is a very similar term to the biceps tendonitis. I believe there is a direct relationship.
 {¶ 136} "* * * *Page 14 
 {¶ 137} "Q. Lastly, Doctor, I want to ask you whether or not you feel [Appellee] developed osteoarthritis secondary to her repetitive activities at Zimmer. Do you have an opinion as to that condition?
 {¶ 138} "* * *
 {¶ 139} "A. I believe that it is a — — the repetitious nature of her job is a large contributing factor in the development of her arthritic changes.
 {¶ 140} "Q. Can someone have osteoarthritis of a shoulder joint and not have rotator cuff tendonitis?
 {¶ 141} "A. Yes.
 {¶ 142} "Q. And can someone have osteoarthritis of their shoulder joint and not have biceps tendonitis or bicipital tenosynovitis?
 {¶ 143} "A. Yes."
 {¶ 144} Id. at 41-43.
 {¶ 145} After hearing all the evidence and deliberations, the jury found Appellee was entitled to participate in the Workers' Compensation Fund for the conditions of left rotator cuff tendonitis, left bicep tendonitis, left bicipital tenosonvitis, and aggravation of arthritis of the acromioclavicular joint. The trial court entered judgment on the verdict on September 22, 2006.
 {¶ 146} On October 6, 2006, Zimmer filed a Motion for Judgment Notwithstanding the Verdict or for New Trial. BWC filed a motion to join Zimmer's motion on October 7, 2006. Via Judgment Entry filed July 9, 2007, the trial court denied Zimmer's motion for JNOV and motion for new trial, finding the verdict was not contrary to law and not *Page 15 
against the manifest weight of the evidence. The trial court overruled BWC's motion as untimely.
 {¶ 147} It is from this judgment entry Zimmer appeals, raising the following assignments of errors:
 {¶ 148} "I. THE TRIAL COURT ERRED IN DENYING ZIMMER ORTHOPEDIC SURGICAL PRODUCTS, INC.'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT OR FOR NEW TRIAL AS THE PLAINTIFF FAILED TO PRODUCE EVIDENCE SUFFICIENT TO SUPPORT EACH ELEMENT OF HER CLAIM FOR PARTICIPATION IN THE WORKERS' COMPENSATION SYSTEM AND THE JURY VERDICT WAS CONTRARY TO THE LAW PREVENTING PARTICIPATION FOR PRE-EXISTING CONDITIONS.
 {¶ 149} "II. WHERE A PARTY REQUESTS THAT SPECIFIC INTERROGATORIES BE PRESENTED TO THE JURY WHICH ARE EXPRESSLY FORMULATED TO DETERMINE IF THE JURY CORRECTLY APPLIED THE LAW TO THE EVIDENCE AND NO ALTERNATIVE JURY INTERROGATORIES ARE REQUESTED, IT IS PREJUDICIAL ERROR FOR A TRIAL COURT, OVER DEFENDANT'S OBJECTION, TO PRESENT UNILATERALLY ALTERED AND ABRIDGED INTERROGATORIES TO THE JURY."
 {¶ 150} BWC also appeals, raising as error:
 {¶ 151} "I. THE TRIAL COURT ERRED IN DENYING THE BWC'S MOTION FOR DIRECTED VERDICT, BASED UPON PLAINTIFF'S FAILURE TO ADDUCE ANY EVIDENCE ON THE THREE ELEMENTS OF NON-SCHEDULED OCCUPATIONAL DISEASED UNDER R.C. 4123.01(F). *Page 16 
 {¶ 152} "II. THE TRIAL COURT ERRED IN FAILING TO SUBMIT THE BWC'S PROPOSED JURY INTERROGATORIES ADDRESSING THE ELEMENTS OF R.C. 4123.01(F) AND AGGRAVATION OF PRE-EXISTING SHOULDER CONDITIONS."
 Zimmer Appeal I BWC Appeal I {¶ 153} Because Zimmer and BWC's first assignments of error are identical, we shall address said assignments of error together. In their first assignments of error, both Zimmer and BWC contend the trial court erred in denying the motions for judgment notwithstanding the verdict or new trial as Appellee failed to present sufficient evidence to support her claim.
 {¶ 154} Civ. R. 50(B) governs motions for judgment notwithstanding the verdict, and provides:
 {¶ 155} "Whether or not a motion to direct a verdict has been made or overruled and not later than fourteen days after entry of judgment, a party may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion; or if a verdict was not returned such party, within fourteen days after the jury has been discharged, may move for judgment in accordance with his motion. A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative. If a verdict was returned, the court may allow the judgment to stand or may reopen the judgment. If the judgment is reopened, the court shall either order a new trial or direct the entry of judgment, but no judgment shall be rendered by the court on the ground that the verdict is against the weight of the evidence. If no *Page 17 
verdict was returned the court may direct the entry of judgment or may order a new trial."
 {¶ 156} When ruling on a motion for judgment notwithstanding the verdict, a trial court applies the same test as in reviewing a motion for a directed verdict. Ronske v. Heil Co., Stark App. No. 2006-CA-00168,2007-Ohio-5417. See also, Pariseau v. Wedge Products, Inc. (1988),36 Ohio St.3d 124, 127, 522 N.E.2d 511. "A motion for judgment notwithstanding the verdict is used to determine only one issue i.e., whether the evidence is totally insufficient to support the verdict."Krauss v. Streamo, Stark App. No. 2001 CA00341, 2002-Ohio-4715, paragraph 14. See, also, McLeod v. Mt. Sinai Medical Center (2006),166 Ohio App.3d 647, 853 N.E.2d 1235, reversed on other grounds,116 Ohio St.3d 139, 876 N.E.2d 1201. Neither the weight of the evidence nor the credibility of the witnesses is a proper consideration for the court.Posin v. A.B.C. Motor Court Hotel, Inc. (1976), 45 Ohio St.2d 271, 275,344 N.E.2d 334. See, also, Civ. R. 50(B); and Osler v. Lorain (1986),28 Ohio St.3d 345, 347, 504 N.E.2d 19. In other words, if there is evidence to support the nonmoving party's side so that reasonable minds could reach different conclusions, the court may not usurp the jury's function and the motion must be denied. Osler, supra.
 {¶ 157} Appellate review of a ruling on a motion for judgment notwithstanding the verdict is de novo. Midwest Energy Consultants,L.L.C. v. Utility Pipeline, Ltd., Stark App. No. 2006CA00048,2006-Ohio-6232; Ronske v. Heil, supra.
 {¶ 158} Appellants contend Appellee is not entitled to participate in the Workers' Compensation Fund as she failed to meet the burden of proof under the statutory requirements of R.C. 4123.01(F). *Page 18 
 {¶ 159} We begin by noting reviewing courts must keep in mind the requirement of R.C. 4123.95 to construe the workers' compensation statutes liberally in favor of employees. Bedford Hts. v. France (1993),67 Ohio St.3d 55, 58.
 {¶ 160} In order to participate in the Workers' Compensation Fund, a claimant must either have been injured at work or have contracted an occupational disease. Appellee asserts her right to participate based upon her contraction of several occupational diseases. Although the conditions for which Appellee seeks benefits are not scheduled occupational diseases under R.C. 4123.68, such conditions will qualify as occupational diseases if each of the prongs of the following test is satisfied:
 {¶ 161} "(1) The disease is contracted in the course of employment; (2) the disease is peculiar to the claimant's employment by its causes and the characteristics of its manifestation or the conditions of the employment result in a hazard which distinguishes the employment in character from employment generally; and (3) the employment creates a risk of contracting the disease in a greater degree and in a different manner than in the public generally." State, ex rel. Ohio Bell Tel. Co.v. Krise (1975), 42 Ohio St.2d 247, 327 N.E.2d 756, at syllabus.
 {¶ 162} Appellants submit Appellee did not satisfy the first prong of the Krise test as she failed to present any evidence her conditions were contracted in the course of her employment with Zimmer. According to Appellants, Appellee's evidence established her conditions were merely the result of an aggravation of pre-existing arthritis, and, under Ohio law, she is not entitled to participate in the Workers' Compensation Fund. Appellants cite Brody v. Mihm (1995), 72 Ohio St.3d 81, for the proposition a claimant can never recover under workers' compensation for the *Page 19 
aggravation of a pre-existing disease. We note only one of Appellee's conditions was an aggravation. We find Appellants have misinterpretedBrody. In Brody, the Ohio Supreme Court reviewed a number of its previous decisions regarding compensation for the aggravation of a pre-existing disease or injury. The Brody Court noted, "claims for aggravation of a pre-existing disease are compensable only where the aggravation itself qualifies as a compensable injury or occupational disease." Id. at 83, 647 N.E.2d 778 (Emphasis added).
 {¶ 163} Dr. Brody was a dentist who filed an occupational disease claim with the Industrial Commission of Ohio, alleging his pre-existing arthritic condition was aggravated by his employment which required him to constantly stand "in a forward bent and twisted position as [he] worked on [his] patients." Id. at 81, 647 N.E.2d 778. After his claim was denied administratively, the claimant appealed to the Stark County Court of Common Pleas, which also found he was not entitled to participate in the State Insurance Fund. Id. This Court affirmed the trial court, finding "the aggravation of a preexisting condition is not compensable when the cause of the aggravation is not itself an occupational disease." Id. at 81-82, 647 N.E.2d 778. The Ohio Supreme Court, which ruled Dr. Brody was precluded from receiving compensation, found "[t]he ordinary physical stresses and strains of [his] dental practice, as a matter of law, are no greater than those which are encountered in ordinary non-employment life." Id. at 84, 647 N.E.2d 778.
 {¶ 164} In other words, a claim for "wear-and-tear" aggravation of a non-occupational disease, i.e., an exacerbation of an existing disorder or disease, resulting from the ordinary stresses and exertions of the job, is not a compensable injury. Id. at *Page 20 
84. The Brody Court explicitly limited its holding to an occupational disease claim for aggravation of a non-occupational disease by normal wear and tear, stressing it was not changing the law in the area of aggravation claims which were already compensable under existing law. Id. at 84, fn. 2. The Brody Court reasoned, "[e]ven if we were to hold compensable a claim for wear-and-tear aggravation of a non-occupational disease, the claimant would have to show that the employment contribution is legally, as well as medically, sufficient to give rise to a compensable disability." Id. at 83, 647 N.E.2d 778 (Citations omitted). "This would require a showing that the work place exertion or cumulative work place exertions are greater than those encountered in ordinary non-employment life." Id. at 84, 647 N.E.2d 778. (Citations omitted).
 {¶ 165} We find the ordinary physical stresses and strains of Appellee's employment as an assembly line worker on the HemoVac line are, as a matter of law, greater than those encountered in ordinary non-employment life. We further find Appellee presented sufficient evidence her conditions were contracted in the course of her employment with Zimmer. Appellee testified she did not have left shoulder problems prior to working in the packaging department at Zimmer. Additionally, Dr. Varrati opined Appellee's repetitious job duties were a major contributing factor in her developing the shoulder conditions.
 {¶ 166} Under the second criterion, a claimant must present evidence from which a jury could infer the occupational disease was peculiar to her own particular kind of employment. Patterson v. Connor (1984),19 Ohio App.3d 304, syllabus, citing Krise, supra. The analysis inPatterson focuses on the claimant's actual job activities rather than on a generic job of a similar nature. Thus, the question is not whether all or most *Page 21 
people employed in a similar job would succumb to a given occupational disease. Rather, the question is whether the claimant has presented evidence the disease is peculiar to her job either by (a) the causes of the disease and the characteristics of the disease's manifestationor (b) the condition of her employment. The claimant's evidence on either of these prongs must show the peculiar causes and characteristics or her working condition resulted in a hazard which distinguished her job from other jobs in general. In other words, as the court inPatterson reasoned, "the emphasis * * * [is] whether the claimant, in his own particular daily activities, [is] more apt than the general public to become so afflicted." Id. at 306.
 {¶ 167} Upon review of the entire record, we conclude Appellee presented sufficient evidence to satisfy the second criterion. Appellee testified in detail about her particular job on the HemoVac line, assembling the HemoVac pump. She noted the job required repetitive movements which she performed over two thousand times per shift, with her arms and shoulders in a forward, elevated reach. Lisa Hadley, Appellee's co-worker, also described the repetitious nature of the work and the speed at which such needed to be performed in order to achieve the daily standard. Dr. Varrati noted Appellee's work required more motion and movement than the average person. We find the jury could reasonably find Appellee's conditions were peculiar to her job duties in the packaging department.
 {¶ 168} Under the third criterion, the claimant must present evidence from which a jury could infer the claimant's employment created a risk of contracting the occupational disease in a greater degree and in a different manner than the general public. Krise, supra, syllabus. In other words, Appellee had to show her risk of contracting the *Page 22 
occupational disease, because of her particular job, exceeded the risk to which the general public or other employees, in general, were exposed or normally subjected. State ex rel. Republic Steel Corp. v. Indus.Comm. (1980), 61 Ohio St.2d 193, 196, 15 O.O.3d 216, 218,399 N.E.2d 1268, 1269-1270.
 {¶ 169} Appellee offered the testimony of Drs. Varrati and Teater, regarding their diagnoses of her shoulder conditions. When x-rays of Appellee's left shoulder were taken in September of 2001, such did not reveal any signs of arthritis. Appellee's shoulder pain began after she commenced working on the HemoVac line. At first, the pain was managed with injections. However, the pain continued to worsen over the years she worked the line. Both doctors testified they had viewed a videotape of the assembly line procedure, and concluded the repetitive nature of the activity caused Appellee's left rotator cuff tendonitis, left bicep tendonitis, and left bicipital tenosynovitis; and aggravated the arthritis in her AC joint. Dr. Varrati specifically stated Appellee in the performance of her work duties was at a higher risk for developing an occupational disease.
 {¶ 170} In summary, Appellee offered testimony she had not previously suffered from any of these conditions, but that her conditions arose while she worked in the packaging department at Zimmer. Appellee provided sufficient evidence to establish a causal connection between her conditions and her employment to warrant the trial court's denial of Appellants' JNOV.
 {¶ 171} In their first assignments of error, Appellants also argue the trial court erred in denying Zimmer's motion for new trial.
 {¶ 172} Civ. R. 59, which governs motions for new trial states, in pertinent part: *Page 23 
 {¶ 173} "A new trial may be granted to all or any of the parties and on all or part of the issues upon any of the following grounds:
 {¶ 174} "* * *
 {¶ 175} "(6) The judgment is not sustained by the weight of the evidence; however, only one new trial may be granted on the weight of the evidence in the same case;
 {¶ 176} "(7) The judgment is contrary to law;"
 {¶ 177} In Helfrich v. Mellon, Licking App. No. 06CA69,2007-Ohio-3358, this Court found when a party files a motion for a new trial because the judgment is not sustained by the sufficiency of the evidence, the trial court must review the evidence presented at trial and weigh the sufficiency of the evidence and the credibility of the witnesses. Helfrich at paragraph 86, citing Rohde v. Farmer (1970),23 Ohio St.2d 82, 262 N.E.2d 685. In reviewing a trial court's decision regarding a motion for new trial, we apply the abuse of discretion standard. Sharp v. Norfolk Western Railway Company, 72 Ohio St.3d 307,1995-Ohio-224, 649 N.E.2d 1219. This Court may not disturb a trial court's decision unless we find the decision was unreasonable, unconscionable, or arbitrary. Id. (Citation omitted).
 {¶ 178} Based upon our analysis of the trial court's ruling on Appellants' JNOV, we find the jury's verdict was supported by the weight of the evidence and the trial court did not abuse its discretion in overruling Appellants' motion for a new trial.
 {¶ 179} Appellants' first assignments of error are without merit and are overruled. *Page 24 
 Zimmer II BWC II {¶ 180} In their second assignments of error, Appellant's maintain the trial court erred in unilaterally altering and abridging specific jury interrogatories Appellants filed when the requested interrogatories were formulated to determine if the jury correctly applied the law and no alternative jury interrogatories were filed.
 {¶ 181} Civ. R. 49(B) states:
 {¶ 182} "The court shall submit written interrogatories to the jury, gathered with appropriate forms for a general verdict, upon request of any party prior to the commencement of argument. Counsel shall submit the proposed interrogatories to the court and to opposing counsel at such time. The court shall inform counsel of its proposed action upon the request prior to their arguments to the jury, that the interrogatories shall be submitted to the jury in the form that the court approves. The interrogatories may be directed to one or more determinative issues whether issues of fact or mixed issues of fact and law."
 {¶ 183} In Cincinnati Riverfront Coliseum, Inc. v. McNulty Co. (1986),28 Ohio St 3d 333, the Ohio Supreme Court held Civ. R. 49 places a mandatory duty upon the trial court to submit interrogatories to the jury, provided the interrogatories are in a form the court approves. "The essential purpose to be served by interrogatories is to test thecorrectness of a general verdict by eliciting from the jury its assessment of the determinative issues presented by a given controversy in the context of evidence presented at trial." Id. at 336-337 (Emphasis added). A trial court is not required reformulate a defective interrogatory. Instead, the court has discretion to reject an *Page 25 
improper interrogatory. Freeman v. Norfolk Western Railway Co. (1994),69 Ohio St.3d 611.
 {¶ 184} We have reviewed Zimmer's proposed interrogatories and compared such with the interrogatories the trial court submitted to the jury. The interrogatories submitted to the jury presented all of the issues embodied in Zimmer's proposed interrogatories, which were redundant and cumulative. We find the trial court did not abuse its discretion in failing to submit Zimmer's interrogatories, as it proposed, to the jury.
 {¶ 185} Appellants' second assignments of error are overruled.
 {¶ 186} The judgment of the Tuscarawas County Court of Common Pleas is
affirmed.
Hoffman, P.J. Wise, J. concurs, Edwards, J. concurs in part and dissents in part *Page 26